# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Anna Griffis,                                          :
                          Petitioner           :
                                          :
               v.                                     :    No. 272 C.D. 2019
                                          :    Argued:  June 9, 2020
Workers' Compensation Appeal           :
Board (Albert Einstein Healthcare       :
Network),                                               :
                        Respondent           :


BEFORE:      HONORABLE RENÉE COHN JUBELIRER, Judge
                  HONORABLE ELLEN CEISLER, Judge (P.)
                  HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                    **FILED:  July 15, 2020**

Before this Court is the petition for review filed by Anna Griffis (Claimant), in which she challenges the Workers' Compensation (WC) Appeal Board's (Board) February 13, 2019 Order.  In that Order, the Board affirmed a Workers' Compensation Judge's (WCJ) August 15, 2017 Decision (2017 WCJ Decision): (1) granting the Modification Petition filed by Albert Einstein Medical Center (Medical Center),[1] thereby allowing Medical Center to subrogate Claimant's third-party civil recovery in her medical malpractice action; (2) denying Claimant's

---

[1] Medical Center is a corporate subsidiary of the Albert Einstein Healthcare Network.  As discussed *infra*, there is a dispute as to which of these entities is Claimant's employer.  However, we refer to Medical Center here and throughout the opinion because it was the entity that filed the Modification Petition and was found by the WCJ to be Claimant's employer.

Review Petition, which sought to expand Claimant's accepted work injuries to include C4-5 and C5-6 disc hernias; and (3) denying litigation costs on the basis that Claimant had not prevailed on any of the contested issues. On appeal, Claimant asserts the Board erred by allowing Medical Center to subrogate her third-party recovery because there was no "third party" involved in that action, Medical Center waived its right to subrogation, and the medical malpractice, if it occurred, did not worsen Claimant's condition. The Board further erred, Claimant asserts, in denying her Review Petition because the medical testimony upon which the WCJ and the Board relied to find the additional injuries were not work related was not competent. Finally, Claimant maintains the Board erred in not directing an award of litigation costs because the WCJ did expand Claimant's work-related injuries to include psychological injuries.

## I. Background

### A. Factual History

#### 1. Claimant's "Employer"

There is a dispute as to which entity employed Claimant at the time of her work injury. Claimant asserts that Albert Einstein Healthcare Network (Healthcare Network) was her employer, and she identified that name on the Petition for Review and the other documents she has filed with this Court. Claimant also offered the June 14, 2013 Decision by the WCJ (2013 WCJ Decision) that resolved multiple review petitions filed by Claimant and a modification petition filed by "[t]he defendant," listed there as Healthcare Network, by a stipulation of the parties. (Reproduced Record (R.R.) at 13a, 16a.) The introductory paragraph of the stipulation of facts related to the 2013 WCJ Decision (2013 Stipulation) identified Healthcare Network as Claimant's employer. (*Id.* at 17a.) However, the Notice of

2

Temporary Compensation Payable (NTCP), which converted to a Notice of Compensation Payable (NCP) by operation of law, lists Claimant's employer as "Long Term Structured Residence – AEHN." (*Id.* at 317a.) Medical Center presented the deposition testimony of its Human Relations Director (HR Director), reflecting that Healthcare Network is merely an umbrella entity that consists of various corporate subsidiaries, including Medical Center and the Einstein Practice Plan, Inc. (EPPI), which do not control each other. (HR Director's Dep. at 8-9, R.R. at 551a-52a.) HR Director testified that Medical Center is Claimant's employer because Belmont Center for Comprehensive Treatment (Belmont), where Claimant worked at the time of her injury, fell within Medical Center's corporate structure. (*Id.* at 9, R.R. at 552a.) A subsequent decision issued by WCJ Michael Rosen on November 11, 2014, identified Medical Center as Claimant's employer. (R.R. at 410a.) In the current litigation, the documents, other than those filed by Claimant with this Court, identify Claimant's employer as Medical Center. The WCJ credited HR Director's testimony over Claimant's conflicting evidence and found that Claimant was employed by Medical Center. (2017 WCJ Decision, Finding of Fact (FOF) ¶ 17.)

### 2. Claimant's Injury

Claimant worked as a Registered Nurse at Belmont until the evening of April 28, 2009, when she fell down a flight of stairs and struck the back of her neck on a handrail. (*Id.* ¶¶ 1-2.) Immediately following the incident, she experienced head and neck pain and numbness and tingling in her right arm. Claimant sought immediate treatment at an emergency room located across the street from Belmont. Claimant was transferred to Medical Center's Emergency Room that evening, where she underwent x-rays and a CT scan at the direction of Kenneth Lavelle, M.D. and

Jay Strain, M.D.  After reviewing Claimant's diagnostic tests, Dr. Lavelle and Dr. Strain discharged Claimant on the morning of April 29, 2009, with the diagnosis of a neck strain.  Following her discharge, Claimant continued to experience worsening symptoms, including tingling and numbness in her right foot and weakness in her right hand.  Claimant reported to Medical Center's Occupational Health facility on April 30, 2009, which transferred her to Medical Center's Emergency Room.  While Claimant was obtaining an emergency MRI scan, she experienced a total inability to move her legs and loss of feeling in her lower body.  Upon review of the MRI film, it was discovered that Claimant had an acute C6-7 disc hernia and hematoma that were compressing her spinal cord resulting in a complete spinal cord injury. Claimant underwent emergency decompression surgery that same day.  Although Claimant regained the use of her lower extremities, she continues to suffer from significant neurological dysfunctions.  She has not returned to any work since April 28, 2009.

An NTCP was issued on May 11, 2009, recognizing Claimant's work-related injury as being in the nature of "cervical strain" and totally disabling.  (*Id.* ¶ 3.)  The NTCP subsequently converted to an NCP by operation of law.  In June 2013, Claimant's work-related injury was expanded, by stipulation of the parties, to include "status post anterior cervical discectomy at C6-7 with evacuation of an epidural hematoma at C6-7 and anterior antibody arthrodesis and application of an anterior plate at C6-7, right C5-6 and C6-7 radiculopathy, right foot drop, and neurogenic bladder." (*Id.* ¶ 4 (internal quotation marks omitted).)  Claimant received ongoing indemnity benefits and medical treatment for these accepted injuries.

### 3. Claimant's Third-Party Civil Action and Settlement

On May 24, 2010, Claimant and her husband (Husband) initiated a civil lawsuit against, among others, Dr. Lavelle, Dr. Strain, Healthcare Network, Medical Center, and EPPI, alleging that Dr. Lavelle and Dr. Strain were negligent because they failed to properly diagnose her cervical spinal cord compression and failed to obtain an MRI. (*Id.* ¶ 5.) As a result of their negligence, Claimant averred she incurred additional medical expenses and could no longer perform her occupation. (*Id.*) Husband filed a claim asserting a loss of consortium. Claimant averred that, due to the neurologic symptoms she was experiencing on April 29, 2009, Dr. Lavelle and Dr. Strain should have ordered an MRI scan, as that is the best method of determining whether a spinal cord injury is present. She further alleged that the doctors' reliance on the CT scan and x-ray results fell below the standard of care for a patient experiencing progressively worsening neurologic symptoms. The parties entered into a high-low arbitration agreement (Arbitration Agreement), which identified Claimant and Husband as the plaintiffs and Dr. Lavelle and Dr. Strain as the defendants. (R.R. at 269a.) The Arbitration Agreement capped the total recovery at $2.4 million and explained how payment of that amount would be split between Broadline Risk Retention Group, Inc. (Broadline RRG) and the Medical Care Availability and Reduction of Error Fund (MCARE Fund) depending on the percentage of liability each doctor was found to have. (*Id.* at 270a-71a.) Following the presentation of evidence, a civil arbitrator found Dr. Lavelle and Dr. Strain negligent and awarded Claimant $2.5 million and Husband $375,000. (Verdict Sheet, R.R. at 267a-68a.) Based upon the arbitrator's apportionment of damages, Claimant's portion of the recovery was $2.088 million. (FOF ¶ 9.) Claimant and Husband subsequently executed a full release against all the parties involved in the

5

medical malpractice action, including Healthcare Network, Medical Center, and EPPI.

### 4. The Petitions

In 2013, Medical Center filed modification petitions seeking subrogation reimbursement per Section 319 of the Workers' Compensation Act (WC Act)[2] against Claimant's civil recovery from her medical malpractice action, but these petitions were dismissed without prejudice for lack of prosecution on November 7, 2014. (Board Opinion (Op.) at 2 n.1; R.R. at 410a-12a.) On December 19, 2014, Medical Center filed the current Modification Petition,[3] seeking subrogation reimbursement per Section 319. (Supplemental Reproduced Record (S.R.R.) at 419b-20b.) Medical Center requested that its relief commence on April 8, 2013. (*Id.* at 419b.) Claimant filed an answer, specifically denying Medical Center's allegations. (Certified Record at Item 4.) On April 27, 2016, Claimant filed her Review Petition, asserting that the description of her injury was incorrect and the NCP should be amended to include C5-6 and C6-7 disc hernias "and a pain disorder associated with both psychological factors and a general medical condition."[4] (S.R.R. at 73b-74b.) In its answer, Medical Center admitted Claimant had

---

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 671.

[3] To obtain subrogation reimbursement due to the commission of medical malpractice during the treatment of a claimant's work-related injury, an employer must show that the claimant's work injury worsened due to the third party's negligence, the employer is paying benefits for the claimant's condition, and the funds that the claimant recovered from the third-party action were for the same conditions for which the employer is paying benefits. *Griffin v. Workers' Comp. Appeal Bd. (Thomas Jefferson Univ. Hosp.)*, 745 A.2d 61, 63-64 (Pa. Cmwlth. 1999).

[4] Pursuant to Section 413(a) of the WC Act, 77 P.S. § 771, a claimant seeking to amend an NCP based on an incorrect description of a work-related injury must show either that when the NCP was issued there was a material mistake of fact or law made, or that consequential injuries have developed as a result of the initial work injuries. *Cinram Mfg., Inc. v. Workers' Comp. Appeal Bd. (Hill)*, 975 A.2d 577 (Pa. 2009).

6

"developed an emotional injury/depression," but denied that the asserted disc hernias were the result of the April 28, 2009, work injury. (*Id.* at 76b.) It is undisputed that Medical Center had been paying for the treatment of Claimant's psychological condition. The Petitions were consolidated and assigned to the WCJ for resolution.

B. *Proceedings before the WCJ*

1. The Modification Petition

(a) The Medical Evidence

In support of its Modification Petition, Medical Center presented the deposition testimony of Lee Harris, M.D.,[5] who testified as follows. Dr. Harris, a board-certified neurologist, examined Claimant at Medical Center's request on October 13, 2014. Following his examination and review of Claimant's medical records, Dr. Harris opined that Claimant's work injury resulted in an acute C6-7 herniated disc that caused a spinal cord compression and a complete spinal cord injury. (FOF ¶ 10.) In his opinion, the nearly two-day delay between Claimant's initial treatment in Medical Center's Emergency Room and the decompression surgery "caused the Claimant to develop significant neurological dysfunction, including bladder dysfunction and ambulatory dysfunction." (*Id.*) Had Claimant's decompression surgery been performed sooner, Claimant would not have experienced complete paraplegia in her lower extremities or developed urologic and neurologic impairments. Further, had Claimant been correctly diagnosed and treated, she would have had "a complete or near complete recovery and would have been able to return to her normal work." (*Id.*)

---

[5] Dr. Harris testified on April 27, 2016, and the transcript from that deposition is found at pages 16b-45b of the supplemental reproduced record and is summarized in finding of fact 10.

7

In opposition to the Modification Petition, Claimant offered the deposition testimony of Robert Sing, D.O., a board-certified family practitioner, who testified as follows.[6] Dr. Sing examined Claimant on April 14, 2016, at which time he obtained a history of Claimant's work injury and the treatment thereof. From his examination, he found that Claimant continued to experience pain and stiffness with spasms in her neck, a dropped right foot, unsteady gait for which she uses a cane, sleep disruptions, a neurogenic bladder, and depression/emotional problems. He also reviewed various medical records related to Claimant's treatment, as well as records related to Claimant's medical malpractice action. After reviewing the reports, but not the studies themselves, from the CT scans initially performed on Claimant's brain and cervical spine, Dr. Sing indicated the CT did not reveal a hemorrhage or trauma to Claimant's brain and no subluxation or fracture of her cervical spine. Reviewing the report, but not the study itself, from the April 30, 2009 MRI of Claimant's cervical spine, Dr. Sing opined that the MRI showed a six-centimeter-long mass at C6-7. In Dr. Sing's opinion, Claimant's disc extrusion at C6-7 did not occur until Claimant was in the MRI machine that day. Dr. Sing opined that CT scans are preferable to MRI scans to diagnose soft tissue injuries, like the one here. (R.R. at 444a-45a.) Thus, in Dr. Sing's opinion, "the emergency room doctors did not commit any malpractice that would have increased the degree or duration of the Claimant's work injury." (FOF ¶ 11(f).) He further explained, even if there had been medical malpractice, it would not have extended Claimant's degree of disability and "she would have ended up here anyway." (R.R. at 455a.)

---

[6] Dr. Sing's deposition testimony is found at pages 416a-92a of the reproduced record and is summarized in finding of fact 11.

8

In rebuttal to Dr. Sing's testimony, Medical Center presented a second deposition of Dr. Harris.[7] Dr. Harris testified that when Claimant initially presented to the emergency rooms, she was already complaining of a tingling sensation in her upper extremities, reflecting that she was experiencing spinal cord compression. (FOF ¶ 12.) The existence of this symptom immediately after the fall establishes that Claimant did not develop the disc hernia while in the MRI two days later. He disagreed with Dr. Sing's testimony that the CT scan was ordered to assess whether Claimant had sustained a soft tissue injury because it was ordered to determine whether she had a fracture. Contrary to Dr. Sing's opinion, Dr. Harris testified that CT scans are used to "identify bony pathology." (*Id.*) He reiterated his earlier opinions that if Claimant had received the decompression surgery following her initial admission to Medical Center's Emergency Room, "she would not have developed weakness and dysthesia in the right upper and lower extremities, ambulatory dysfunction, neurogenic bladder[,] and neuropathic pain syndrome." (*Id.*)

Medical Center also presented the deposition testimony of Robert Pinsk, M.D., a board-certified radiologist, who reviewed the films of Claimant's cervical CT scans and the MRI scan of her cervical spine and testified as follows.[8] Dr. Pinsk noted that the CT films revealed degenerative changes at C5-6 and a moderate disc hernia on the right side of C6-7 that was affecting Claimant's spinal cord and causing spinal stenosis. The MRI films showed an eight-millimeter "mass-like structure posterior to the C6-7 space causing mass effects upon the cervical spinal cord and

---

[7] Dr. Harris's second deposition was taken on August 26, 2016. The transcript of that deposition is found at pages 157a-63a of the reproduced record and is summarized in finding of fact 12.

[8] Dr. Pinsk's deposition testimony is found at pages 575a-81a of the reproduced record and is summarized in finding of fact 13.

severe central spinal stenosis." (*Id.* ¶ 13.) Like Dr. Harris, Dr. Pinsk disagreed with Dr. Sing's position that CT scans are superior to MRI scans at assessing soft tissue pathology. Dr. Pinsk noted that Dr. Sing did not review the actual films of any diagnostic studies. Instead Dr. Sing was only repeating what was included on those studies' reports, as evidenced by Dr. Sing's testimony that Claimant's C6-7 disc herniation was six **centimeters** in length, which was clearly a typographical error in the report as disc hernias are measured in **millimeters**.

(b) Other Evidence

In addition to the medical evidence, Medical Center relied on HR Director's deposition testimony in support of its Modification Petition.[9] As mentioned, HR Director described the relationship between Healthcare Network and its separate, subsidiary corporate entities, such as Medical Center and EPPI. She testified as follows. Claimant worked for Medical Center when she was injured, and Dr. Lavelle and Dr. Strain were employed by EPPI. EPPI, Medical Center, and Healthcare Network are separate corporate entities with distinct and separate chains of command without financial interest or ownership interest in each other. Finally, HR Director pointed out that Medical Center's Emergency Room was not an employee dispensary but a trauma center.

Claimant testified before the WCJ and by deposition as follows.[10] She was employed by "Albert Einstein Health Systems." (FOF ¶ 15.) Claimant continues to seek treatment for her work-related injuries with various physicians and has

---

[9] HR Director's deposition testimony is found at pages 545a-72a of the reproduced record and is summarized in finding of fact 14.

[10] Claimant's deposition testimony is found at pages 1a-10a of the reproduced record, and her testimony from a June 21, 2016 hearing is found at pages 80b-115b of the supplemental reproduced record. Claimant's testimony is summarized in findings of fact 15 and 16.

10

difficulty functioning. Claimant continues to receive her WC benefits, as well as Social Security Disability benefits. Claimant explained her symptoms worsened progressively from the time of the fall until she underwent the MRI. (*Id.* ¶ 16.) Believing she was not properly treated initially, Claimant retained counsel in May 2010 to bring her medical malpractice action.

Medical Center also introduced into evidence the original civil complaint, the Agreement, the arbitrator's verdict sheet, and the full and final release signed by Claimant and Husband. Claimant also introduced a discovery deposition of Dr. Lavelle from the medical malpractice action, in which she claims he testified that on April 29, 2009, he was employed by Healthcare Network. However, Dr. Lavelle was asked where he was employed, not by whom he was employed. (R.R. at 325a.)

2. The Review Petition

In addition to her own testimony, Claimant relied on Dr. Sing to support her Review Petition. Dr. Sing testified as follows. Based on his review of a report of a 2016 MRI of Claimant's cervical spine, Dr. Sing opined that Claimant had developed disc hernias at C4-5 and C5-6, which are two levels higher than the acknowledged C6-7 disc hernia. (FOF ¶ 11(g).) He related these two new hernias to Claimant's initial injury and surgery as being "evolutionary herniations . . . due to the instability of her cervical spine, the hardware and just day-to-day functioning . . . ." (R.R. at 439a-40a.) Therefore, Dr. Sing opined these two hernias were also work related.

Medical Center presented Dr. Harris's and Dr. Pinsk's deposition testimony in opposition to the Review Petition. After reviewing the actual films of Claimant's diagnostic studies, Dr. Harris opined that the 2016 MRI did not reveal a disc hernia at C5-6, although there was a protrusion that was present in an August 2009 MRI.

11

In Dr. Harris's opinion, the changes at C4-5 and C5-6 were the result of preexisting, long-standing degenerative changes, not the work injury. (FOF ¶ 12.) Dr. Pinsk noted that Claimant's diagnostic studies only showed mild degenerative changes between C2-3 and C5-6. (*Id.* ¶ 13.)

### 3. The 2017 WCJ Opinion

Reviewing this evidence, the WCJ found Claimant's testimony generally credible but rejected that testimony to the extent it was contradicted by Medical Center's expert medical evidence and by HR Director's testimony as to what entity employed Claimant and Drs. Lavelle and Strain. (*Id.* ¶ 17.) The WCJ found the opinions of Dr. Harris and Dr. Pinsk credible and rejected the contrary opinions of Dr. Sing as not credible. In making these determinations, the WCJ noted that Dr. Harris and Dr. Pinsk reviewed the actual CT and MRI films to render their opinions,[11] and Dr. Sing relied solely on the reports of those studies by other physicians. (*Id.* ¶ 19.) The WCJ further observed that Dr. Sing's opinions were "completely contrary to the civil verdict that has already established the malpractice in issue." (*Id.*) In contrast, the WCJ found that the opinions of Dr. Pinsk and Dr. Harris are "consistent with the Claimant's unchallenged testimony about the development of her symptoms and the civil verdict." (*Id.*) The WCJ found that, to the limited extent Dr. Lavelle's deposition was relevant, it was not persuasive given the result of the third-party lawsuit and the credible testimony of Medical Center's witnesses.

---

[11] This finding states, conflictingly, that Dr. Sing did review and did not review the films. However, given the evidence and the WCJ's other findings, this appears merely to be a typographical error and the first reference to Dr. Sing was intended to be Dr. Pinsk.

Based on the credited evidence, the WCJ concluded that, due to the malpractice committed by Dr. Lavelle and Dr. Strain, "Claimant has developed permanent neurological impairment and dysfunction including ambulatory dysfunction and neurologic dysfunction that has required [Medical Center] to continue to pay compensation for total disability and related medical expenses." (*Id.* ¶ 20.) Therefore, the WCJ held that Medical Center established its right to subrogation against Claimant's third-party civil recovery. (2017 WCJ Decision, Conclusions of Law (COL) ¶ 2.) The WCJ further found that, due to the lack of credible expert evidence, Claimant did not prove that the C4-5 and C5-6 disc hernias were related to her work injury. (*Id.* ¶ 1.) Finally, noting that Medical Center had agreed that Claimant's work injury included a psychological component following the filing of the Review Petition, the WCJ found this issue was not actually in dispute. (FOF ¶ 21.) Accordingly, the WCJ did not award litigation costs because Claimant had not prevailed on any litigated issues. (COL ¶ 4.)

### C. The Board's Opinion

Claimant appealed to the Board, arguing that the grant of the Modification Petition, the denial of the Review Petition, and the denial of litigation costs were in error. Claimant first asserted that there was no "third-party" recovery in this matter because her employer and the entity from which she recovered in that action were the same, the right to subrogation is either waived or barred by res judicata or laches, and the medical malpractice did not worsen Claimant's medical condition. The Board disagreed with each of Claimant's contentions. The Board held that, in cases involving multiple, affiliated corporate entities, the Supreme Court has held that, for purposes of the WC Act, each "subsidiary corporate entity retains its own identity separate and apart from another subsidiary corporation and the parent corporation."

13

(Board Op. at 4 (citing *Kiehl v. Action Mfg. Co.*, 535 A.2d 571 (Pa. 1987)).) Citing HR Director's credited testimony, the Board held that the record does not support Claimant's argument because Medical Center is a separate corporate entity from EPPI, which employed Dr. Lavelle and Dr. Strain, and both of those entities are separate corporate entities from the parent corporation, Healthcare Network. (*Id.* at 10.) Pursuant to *Kiehl*, each of these corporate entities retained their own identities and, therefore, the Board concluded that the WCJ did not err in holding that Medical Center could recover its subrogation lien.

As for Claimant's res judicata arguments, which were premised on a contention that the identity of her employer was settled in prior litigation, the Board held that there was no evidence that the corporate identity of Claimant's employer had ever been determined. (*Id.* at 11.) In addition, observing that subrogation under Section 319 is automatic, the Board held that equitable defense of laches is not applicable and that while an employer can compromise or waive its subrogation rights, this must be agreed to by the parties and set forth in writing. (Board Op. at 4-5 (citing *Superior Lawn Care v. Workers' Comp. Appeal Bd. (Hoffer)*, 878 A.2d 936 (Pa. Cmwlth. 2005); *Rissmiller v. Workers' Comp. Appeal Bd. (Warminster Twp.)*, 768 A.2d 1212 (Pa. Cmwlth. 2001)).) As laches cannot apply, and Claimant did not present an executed agreement whereby Medical Center agreed not to assert a subrogation interest, the Board found no merit in Claimant's arguments.

The Board similarly found that Claimant's arguments that Medical Center did not meet its burden of showing that the medical malpractice worsened Claimant's work injury were without merit. Pointing to the credited testimony of Dr. Harris, the Board held that the WCJ's finding in this regard was supported by substantial evidence. Because it was undisputed that Medical Center paid Claimant benefits for

14

the work injuries and the neurological issues that resulted from the negligent care and that the $2.4 million award was for damages related to that negligent care, the Board concluded Medical Center established its entitlement to subrogation. (*Id.* at 11-12.)

Claimant next argued the WCJ erred in denying the Review Petition because Dr. Harris's opinion that the C4-5 and C5-6 disc hernias were not work-related was not competent since he was unaware that Claimant's accepted work injury included C5-6 radiculopathy. The Board rejected this argument, noting that the WCJ's decision to credit Dr. Harris's opinions was not subject to its review, and there was no evidence that such decision was arbitrary and capricious. (*Id.* at 13.) It explained that the record showed "that Dr. Harris was well-versed on Claimant's conditions," as reflected in his thorough review of Claimant's diagnostic studies and medical records. (*Id.*) More importantly, the Board held, the WCJ did not credit Dr. Sing's testimony and, therefore, Claimant could not meet her burden of proving that the description of her work injuries should be expanded to include the additional cervical disc hernias. (*Id.*)

Finally, Claimant challenged the denial of litigation costs, noting that she was successful in part because the WCJ did expand the description of her work injury to include a psychological component. The Board discerned no error in the WCJ's denial of litigation costs because the injury added was not a matter at issue due to Medical Center's acceptance thereof at the beginning of the litigation and its payment of the medical costs associated therewith. Because Claimant did not prevail on any of the contested issues, the Board held she was not entitled to litigation costs. (*Id.* at 14 (citing *Barrett v. Workers' Comp. Appeal Bd. (Sunoco, Inc.)*, 987 A.2d 1280 (Pa. Cmwlth. 2010), *overruled on other grounds by Crocker v. Workers'*

*Comp. Appeal Bd. (Georgia Pac. LLC)*, 225 A.3d 1201 (Pa. Cmwlth. 2020)).)

Claimant now petitions this Court for review.[12,13]

## II. Claimant's Appeal

### A. Modification Petition

#### 1. General Legal Principles

Section 319 of the WC Act provides, in relevant part:

> **Where the compensable injury is caused in whole or in part by the act or omission of a third party, the employer shall be subrogated to the right of the employe** . . . to the extent of the compensation payable under this article by the employer; reasonable attorney's fees and other proper disbursements incurred in obtaining a recovery or in effecting a compromise settlement shall be prorated between the employer and employe . . . . The employer shall pay that proportion of the attorney's fees and other proper disbursements that the amount of compensation paid or payable at the time of recovery or settlement bears to the total recovery or settlement. Any recovery against such third person in excess of the compensation theretofore paid by the employer shall be paid forthwith to the employe, . . . and shall be treated as an advance payment by the employer on account of any future instalments of compensation.

77 P.S. § 671 (emphasis added). Our Supreme Court has described subrogation under Section 319 as follows:

> Subrogation in our workers' compensation system is a significant and firmly established right. Specifically, while subrogation is an important equitable concept that applies whenever a debt or obligation is paid by one party though another is primarily liable, . . . in the realm of workers'

---

[12] Our review in WC matters "is limited to a determination of whether constitutional rights were violated, errors of law were committed, or the necessary findings were supported by substantial, competent evidence." *Griffin*, 745 A.2d at 63 n.3.

[13] By Memorandum Opinion and Order dated July 9, 2019, a single judge of this Court denied Claimant's Petition for Supersedeas following telephone argument during which the parties agreed to maintain the status quo. *Griffis v. Workers' Comp. Appeal Bd. (Albert Einstein Healthcare Network)* (Pa. Cmwlth., No. 272 C.D. 2019, filed July 9, 2019).

16

compensation, it has assumed even greater stature. **Our Court has stated that the statutory right to subrogation is "absolute and can be abrogated only by choice."** . . . . This is so because the statute granting subrogation "clearly and unambiguously" provides that the employer "shall be subrogated" to the employee's right of recovery. . . . . **Thus, the importance and strength of subrogation in our system of workers' compensation cannot be understated**.

Yet, whether an employer is entitled to subrogation in any given case remains depend[e]nt upon the statutory provision that creates this right. Thus, [the court must consider] the issue of whether the statutory provision granting subrogation, Section 319, affords [an employer] a right to subrogation over monies recovered by [the claimant] pursuant to a settlement of [the particular third-party] action . . . .

*Brubacher Excavating, Inc. v. Workers' Comp. Appeal Bd. (Bridges)*, 835 A.2d 1273, 1275-76 (Pa. 2003) (emphasis added) (citations omitted). The policy behind subrogation under the WC Act is to prevent double recovery for the same injury, to prevent an employer from having to pay compensation due to the wrongful acts of a third party, and to prevent a third party from escaping liability for its wrongful conduct. *Poole v. Workers' Comp. Appeal Bd. (Warehouse Club, Inc.)*, 810 A.2d 1182, 1184 (Pa. 2002). Whether an employer is entitled to subrogation is a question of law based upon the facts as found by a WCJ. *Griffin v. Workers' Comp. Appeal Bd. (Thomas Jefferson Univ. Hosp.)*, 745 A.2d 61, 63 n.3 (Pa. Cmwlth. 1999).

In determining whether a WCJ's findings are supported by substantial evidence,[14] we "consider the evidence as a whole, view the evidence in the light most favorable to the party who prevailed before the WCJ, and draw all reasonable inferences which are deducible from the evidence in" that party's favor. *Frog, Switch & Mfg. Co. v. Workers' Comp. Appeal Bd. (Johnson)*, 106 A.3d 202, 206 (Pa.

---

[14] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *City of Philadelphia v. Workers' Comp. Appeal Bd. (Kriebel)*, 29 A.3d 762, 769 (Pa. 2011).

17

Cmwlth. 2014) (quotation omitted). Where both parties present evidence, it does not matter if there is evidence that supports a contrary finding; the only question is whether there is evidence that supports the findings that were made. *McCabe v. Workers' Comp. Appeal Bd. (Dep't of Revenue)*, 806 A.2d 512, 515 (Pa. Cmwlth. 2002). "The WCJ is the ultimate fact finder and has complete authority for making all credibility" and evidentiary weight determinations. *Rife v. Workers' Comp. Appeal Bd. (Whitetail Ski Co.)*, 812 A.2d 750, 755 (Pa. Cmwlth. 2002). It is well-settled that a "WCJ may reject the testimony of any witness in whole or in part, even if that testimony is uncontradicted." *Hoffmaster v. Workers' Comp. Appeal Bd. (Senco Prod., Inc.)*, 721 A.2d 1152, 1156 (Pa. Cmwlth. 1998). Where the WCJ is required to assess the credibility of deposition testimony, the WCJ must articulate objective bases for crediting one witness's deposition testimony over another witness's deposition testimony. *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.)*, 828 A.2d 1043, 1053-54 (Pa. 2003). In the rare instances where we review a credibility determination, "[w]e must view the reasoning as a whole and overturn the credibility determination only if it is arbitrary and capricious or so fundamentally dependent on a misapprehension of material facts, or so otherwise flawed, as to render it irrational." *Casne v. Workers' Comp. Appeal Bd. (Stat Couriers, Inc.)*, 962 A.2d 14, 19 (Pa. Cmwlth. 2008).

  2. <u>Whether Claimant's recovery in the medical malpractice action was a "third-party" award subject to subrogation under Section 319.</u>

On appeal, Claimant argues there can be no WC subrogation of her civil recovery pursuant to Section 319 of the WC Act and the Medical Care Availability

and Reduction of Error (MCARE) Act[15] because there was no third party involved in the civil action. Arguing that subrogation is an equitable doctrine to which equitable principles apply, *Remy v. Michael D's Carpet Outlets*, 571 A.2d 446, 452 (Pa. Super. 1990), Claimant argues there can be no subrogation here because an employer cannot assert subrogation against itself. Claimant maintains that the identity of her employer was previously stipulated to in the 2013 WCJ Decision and was listed on her NTCP as being Healthcare Network. (Claimant's Brief (Br.) at 17.) In her view, this prior identification of Healthcare Network as her employer precludes further litigation over that issue pursuant to the principles of res judicata, which apply in WC matters. *Weney v. Workers' Comp. Appeal Bd. (Mac Sprinkler Sys., Inc.)*, 960 A.2d 949, 957 (Pa. Cmwlth. 2008). The import of this conclusion, Claimant asserts, is that because both Medical Center and EPPI fall under Healthcare Network's corporate umbrella, they are not separate and distinct corporate entities so as to support the conclusion that there was a "third party" involved in this matter. Claimant further argues that while the WCJ credited HR Director's testimony that EPPI employed Dr. Lavelle and Dr. Strain, such testimony was contrary to Dr. Lavelle's testimony that he was employed by Healthcare Network, which the WCJ rejected without elaboration.

---

[15] Act of March 20, 2002, P.L. 154, *as amended*, 40 P.S. §§ 1303.101-1303.910. The Pennsylvania Association For Justice has filed an amicus curiae brief asserting that the MCARE Act prohibits an employer from asserting any claim for subrogation of either past or future WC benefits paid under Section 319 of the WC Act. The Pennsylvania Association For Justice further asserts that Healthcare Network is Claimant's employer and its right to subrogation under the WC Act was waived here because it was not asserted during the litigation in the prior proceedings. While the second argument addresses an issue specifically raised by Claimant in this case, the first argument, as well as other arguments regarding the MCARE Act prohibiting any subrogation, relate to two consolidated petitions for review involving the same parties, argument on which was heard on the same day as this matter, *Griffis v. Workers' Compensation Appeal Board (Albert Einstein Medical Center)* (Pa. Cmwlth., Nos. 273, 280 C.D. 2019, filed July 15, 2020).

19

Medical Center responds that the right to subrogation under Section 319 is absolute and it is well settled that a WC defendant can recover a subrogation reimbursement from a claimant's civil medical malpractice action where the treatment arose out of the claimant's work injury. Claimant's challenges to the 2017 WCJ Decision and the Board's affirmance thereof, Medical Center argues, are really challenges to the WCJ's credibility determinations. According to Medical Center, in continuing to assert that Healthcare Network is her employer, Claimant is asking the Court to disregard the WCJ's acceptance of HR Director's testimony as credible, testimony that supports the finding that Medical Center employed Claimant and EPPI employed Dr. Lavelle and Dr. Strain. According to Medical Center, Dr. Lavelle's discovery deposition, which the WCJ found irrelevant and unpersuasive, went to Claimant's treatment, not for whom Dr. Lavelle was employed. Medical Center points out that even this part of Dr. Lavelle's testimony was equivocal. (S.R.R. at 434b, 437b-38b.) Medical Center argues the NTCP issued and the "pro forma" 2013 WCJ Decision similarly do not support Claimant's contention that it was error for the WCJ to find that Medical Center was Claimant's employer. (Medical Center's Br. at 36.) According to Medical Center, the NTCP accurately listed Claimant's employer as "Long Term Structured Residence – AEHN," (R.R. at 317a), because Claimant worked for a long-term structured residence when she was injured. And, Medical Center asserts, the 2013 WCJ Decision and stipulation were not the result of litigation and did not adjudicate what entity employed Claimant, Dr. Lavelle, and Dr. Strain, but were related to Claimant's attempt to expand the description of her work injury. At that time, Medical Center asserts, the precise identity of Claimant's employer was immaterial because Claimant's injury had already been acknowledged and she was receiving benefits. Medical Center asserts

20

the 2013 WCJ Decision and 2013 Stipulation are not res judicata on the issue to be decided in this matter because the issue **decided** in those proceedings was not identical to the issue presented in this case, the identity of Claimant's employer was **not fully litigated** in those proceedings, and any determination of who Claimant's employer was, if there was one, **was not essential** to the judgment in the 2013 WCJ Decision. Thus, Medical Center asserts, the Board's observation that there was no evidence supporting the claim that the corporate entity had not been previously established was accurate.

Medical Center further asserts that Claimant's "no third party" argument is premised on the contention that distinct, but related, corporate entities must be treated as a single corporate entity for purposes of the WC Act. This, however, is inaccurate, Medical Center argues, because in *Kiehl* the Supreme Court held that, in analyzing the identity of employers under the WC Act, related corporate entities retain their individual corporate identities for liability purposes. Here, Claimant was employed by Medical Center and Dr. Lavelle and Dr. Strain were employed by EPPI, two corporate entities that, while related, are distinct. As a result, Medical Center asserts, Claimant was allowed to bring the civil action against them and Medical Center was allowed to assert its subrogation claim against the civil recovery Claimant received. The WCJ's findings in this regard are supported by substantial evidence, HR Director's credited testimony, and, therefore, Medical Center argues, Claimant's contentions must be rejected.

Initially, we note that Claimant's arguments that her time of injury employer was Healthcare Network, rather than Medical Center, are understandable given the references to Healthcare Network as the "employer" on the NTCP and in the prior proceedings relating to Claimant's injury. Nonetheless, for the reasons set forth

21

below, these references do not require the reversal of the WCJ's finding that Claimant worked for Medical Center and not Healthcare Network.

We first address Claimant's assertion that the identity of her employer as Healthcare Network was previously litigated and resolved and, therefore, that res judicata precludes the relitigation of that issue in the present matter. Res judicata includes two related, but distinct principles: technical res judicata and collateral estoppel. For a party "to invoke either [technical] res judicata or collateral estoppel[,] the issues presented . . . must be the same as those raised in the instant action." *Safeguard Mut. Ins. Co. v. Williams*, 345 A.2d 664, 668 (Pa. 1975). All of the elements related to these principles must be met in order for res judicata to bar the subsequent litigation. *Armco Steel Corp. v. Workmen's Comp. Appeal Bd.*, 431 A.2d 363, 365 (Pa. Cmwlth. 1981).

"Technical res judicata provides that when a final judgment on the merits exists, a future suit between the parties on the same cause of action is precluded." *Henion v. Workers' Comp. Appeal Bd. (Firpo & Sons, Inc.)*, 776 A.2d 362, 365 (Pa. Cmwlth. 2001). Technical res judicata, or claim preclusion, applies where the following is the same: (1) the "identity of the thing sued upon or for"; (2) the "identity of the cause of action"; (3) the "identity of the persons and parties to the action"; and (4) the "identity of the quality or capacity of the parties suing or sued." *Weney*, 960 A.2d at 954 (citation omitted). "[C]auses of action are identical when the subject matter and the ultimate issues are the same in both the old and the new proceedings." *Henion*, 776 A.2d at 366. Technical res judicata applies to matters raised and to those matters that should have been raised in an earlier proceeding. *Id.*

"Collateral estoppel acts to foreclose litigation **in a later action of issues of law or fact that were actually litigated and necessary to a previous final**

22

**judgment**." *Id.* at 365 (emphasis added). Collateral estoppel prevents the relitigation of an already-decided issue and will apply in workers' compensation proceedings when: (1) "the issue in the prior adjudication was identical to the one presented in the later action"; (2) "there was a final judgment on the merits"; (3) "the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication"; (4) "the party against whom it is asserted has had a full and fair opportunity to litigate the issue in a prior action"; and (5) "the determination in the prior proceeding was essential to the judgment." *Callaghan v. Workers' Comp. Appeal Bd. (City of Phila.)*, 750 A.2d 408, 412 (Pa. Cmwlth. 2000).

It appears from Claimant's arguments that she is asserting that collateral estoppel precludes Healthcare Network and Medical Center from asserting that an entity other than Healthcare Network was Claimant's employer because, she maintains, that **issue** was already litigated and resolved in the NTCP, the 2013 WCJ Decision, and 2013 Stipulation. Although this is a close question because Healthcare Network was identified as Claimant's employer in those documents, collateral estoppel requires that the issue of law or fact to be foreclosed in subsequent litigation had to be "**actually litigated and necessary to a previous final judgment**." *Henion*, 776 A.2d at 365 (emphasis added). Further, the issues litigated in both proceedings have to be the same, and the determination on that issue had to be essential to the judgment. *Callaghan*, 750 A.2d at 412. Reviewing these documents, these requirements were not satisfied so as to give them preclusive effect on the matter at issue here: which corporate entity was Claimant's employer at the time of her work injury on April 28, 2009.

The issuance of the NTCP was not the result of any litigation. Rather, it is a standard form filed with the WC authorities through which compensation payments

23

may be initiated without prejudice and without admitting liability for a 90-day period while an employer is uncertain whether a compensable work injury occurred. Section 406.1(d) of the WC Act, 77 P.S. § 717.1(d).[16] Further, the issue litigated and resolved in the 2013 WCJ Decision and 2013 Stipulation was not "who" Claimant's employer was, but "what" Claimant's work-related injuries should be, and whether Claimant's benefits could be modified based on the results of an impairment rating evaluation (IRE). (R.R. at 15a-20a.) Notably, the 2013 Stipulation merely identified Healthcare Network as the employer in the introductory paragraph and there was no stipulation to that fact elsewhere in the document. Therefore, Claimant did not meet her burden of proving all of the elements necessary to successfully assert that the identity of her employer was finally litigated prior to the current matter so as to invoke the preclusive effect of collateral estoppel here. Thus, Medical Center was not precluded from establishing that it, rather than Healthcare Network, was Claimant's employer, which it did through the credited testimony of HR Director.

Ultimately, the question of which entity employed Claimant at the time of her injury was one of fact for the WCJ to resolve. Crediting HR Director's testimony, the WCJ found that Claimant worked for Medical Center and that Dr. Lavelle and Dr. Strain were employed by EPPI, which is a corporate entity separate and distinct from both Healthcare Network and Medical Center. The WCJ did not credit Claimant's own testimony regarding her employer or the testimony of Dr. Lavelle, which, Claimant asserts, proves that Dr. Lavelle was employed by Healthcare Network. In doing so, the WCJ found Dr. Lavelle's testimony irrelevant and unpersuasive given the result of the medical malpractice action and the credibility of Medical Center's witnesses. Reviewing that finding, we cannot say it was

---

[16] Section 406.1 was added by Section 3 of the Act of February 8, 1972, P.L. 25.

24

"arbitrary and capricious or so fundamentally dependent on a misapprehension of material facts, or so otherwise flawed, as to render it irrational." *Casne*, 962 A.2d at 19. Thus, Claimant was employed by Medical Center, and Dr. Lavelle and Dr. Strain were employed by EPPI, and these two corporate entities are subsidiaries of Healthcare Network. The Court must now consider how these corporate entities should be treated for purposes of the WC Act.

In *Kiehl*, our Supreme Court addressed the question of a parent corporation's liability to employees of a wholly-owned subsidiary who were injured and brought negligence actions against the parent corporation. 535 A.2d at 572. The parent corporation argued it was entitled to immunity, pursuant to the exclusivity provisions of the WC Act, from the third-party suits brought by those employees. The trial court agreed and entered judgment against the employees, which the Superior Court affirmed. On further appeal, the Supreme Court reversed. In doing so, the Court held that, for WC purposes, "where a parent/subsidiary relationship is established[,] the question of which corporation has control over an employee is determined by focusing on the functions performed by each corporation and by the employee in addition to other indicia of control." *Id.* at 573 (emphasis omitted). Reviewing the functions of the parent corporation and subsidiary corporation, as well as the functions of the employees of the subsidiary corporation, in *Kiehl*, the Supreme Court explained that "[t]he operational functions" of each corporation and its employees were "distinct" and they had separate corporate existences. *Id.* at 574. Thus, in Pennsylvania, the Supreme Court concluded, "a parent corporation and its subsidiary must be regarded as separate entities in regards to the [WC] Act." *Id.* Therefore, the parent corporation in *Kiehl* had to be treated as a separate entity from

25

its subsidiary corporation and was not entitled to rely on the latter's WC immunity to shield itself from liability in the third-party actions.

Although Claimant's appeal does not involve a parent corporation seeking to invoke the immunity protection of a subsidiary corporation, the Supreme Court's holding that these two corporate entities must be regarded as separate is equally applicable here. Here, Claimant asserts there is no "third party" in her medical malpractice action because it was her employer that paid to settle that action. This argument assumes either that Claimant and Drs. Lavelle and Strain were all employed by Healthcare Network or that, because EPPI and Medical Center fall under Healthcare Network's umbrella, they are all essentially the same corporation. First, as discussed above, per HR Director's credited testimony, EPPI employed Dr. Lavelle and Dr. Strain and Medical Center employed Claimant. Therefore, the first assumption is not applicable.

The second assumption is contrary to the Supreme Court's holding in *Kiehl* and the WCJ's factual findings, based on HR Director's credited testimony, that EPPI, Healthcare Network, and Medical Center are separate corporate entities. (R.R. at 551a-52a.) HR Director testified that neither EPPI nor Medical Center owned or had financial control over the other, and their employees are not within the same chain of command. (*Id.* at 553a-54a, 556a-60a.) According to HR Director, EPPI and the Medical Center serve different purposes within the Healthcare Network. (*Id.* at 572a.) HR Director's testimony referred to Healthcare Network as an umbrella entity for marketing purposes and when asked whether Healthcare Network owned or had a financial interest in these subsidiaries, she responded that she was "not aware that it does." (*Id.* at 571a-72a.) Nonetheless, HR Director's credited testimony established that Healthcare Network is used to market the various services

26

provided by the subsidiary corporations, which is a different function than those provided by the subsidiary corporations. Thus, *Kiehl* applies here and requires each of these corporate entities to be treated as separate entities for the purposes of the WC Act. *Kiehl*, 535 A.2d at 574. As such, Claimant's argument that there was no "third-party" recovery from which Section 319 subrogation could be taken fails.[17]

### 3. Whether the Section 319 subrogation claim is waived and/or barred by res judicata or the doctrine of laches.

Claimant alternatively argues that, even if there was a potential right to subrogation, the right was waived because Medical Center did not preserve that right prior to the 2013 WCJ Decision. Citing the fact that Healthcare Network, Medical Center, and EPPI were all parties to the final release in the civil action, Claimant contends Medical Center was aware that it may have a right to subrogation against Claimant's medical malpractice award but did not take action to assert or protect that right when it signed the stipulation in 2013. Rather, it waited until December 2014 to assert and pursue its subrogation claim, which Claimant argues was not a prompt assertion of that interest and prevents the grant of the Modification Petition pursuant to *Liberty Mutual Insurance Company v. Excalibur Management Services*, 81 A.3d 1024 (Pa. Cmwlth. 2013). Therefore, Claimant asserts that the subrogation claim is barred either by the principles of res judicata or the doctrine of laches.[18]

---

[17] Medical Center also argues, in the alternative, that the injuries Claimant sustained as a result of her treatment in the Emergency Room did not arise in the course and scope of her employment, as she was being treated as a member of the general public and like any other member of the paying public. (Medical Center's Br. at 40 n.12.) Because of our disposition, we need not reach this issue.

[18] The Pennsylvania Association For Justice likewise asserts that the subrogation claim is waived due to the untimely assertion of those rights. (Amicus Curiae's Br. at 22-25.)

Medical Center responds that Claimant's arguments that its subrogation claim is waived or somehow barred are without merit. First, it points out that *Liberty Mutual Insurance* is distinguishable. That matter involved a subrogation claim under the second paragraph of Section 319,[19] which applies to situations where a non-workers' compensation insurer initially pays disability and/or medical benefits to the injured worker, and that insurer is seeking to subrogate after it is determined that the injury was work related. This matter involves subrogation under the first paragraph of Section 319 making Claimant's reliance on *Liberty Mutual Insurance* misplaced. Second, contrary to Claimant's assertions, Medical Center maintains

[19] Section 319 provides in its entirety:

> Where the compensable injury is caused in whole or in part by the act or omission of a third party, the employer shall be subrogated to the right of the employe, his personal representative, his estate or his dependents, against such third party to the extent of the compensation payable under this article by the employer; reasonable attorney's fees and other proper disbursements incurred in obtaining a recovery or in effecting a compromise settlement shall be prorated between the employer and employe, his personal representative, his estate or his dependents. The employer shall pay that proportion of the attorney's fees and other proper disbursements that the amount of compensation paid or payable at the time of recovery or settlement bears to the total recovery or settlement. Any recovery against such third person in excess of the compensation theretofore paid by the employer shall be paid forthwith to the employe, his personal representative, his estate or his dependents, and shall be treated as an advance payment by the employer on account of any future instalments of compensation.

> Where an employe has received payments for the disability or medical expense resulting from an injury in the course of his employment paid by the employer or an insurance company on the basis that the injury and disability were not compensable under this act in the event of an agreement or award for that injury the employer or insurance company who made the payments shall be subrogated out of the agreement or award to the amount so paid, if the right to subrogation is agreed to by the parties or is established at the time of hearing before the referee or the board.

77 P.S. § 671.

28

laches and other equitable principles do not apply to subrogation claims under the first paragraph of Section 319 and claims delayed for periods longer than the 18 months at issue here have been allowed because the right to subrogation is absolute. *Young v. Workers' Comp. Appeal Bd. (Chubb Corp.)*, 88 A.3d 295, 302 (Pa. Cmwlth. 2014); *Superior Lawn Care*, 878 A.2d at 941. Medical Center further notes that it first began asserting its subrogation claim in 2013. (Medical Center's Br. at 45 n.13.) Medical Center argues that when it filed the current Modification Petition, Claimant challenged any modification of her benefits from the beginning on the basis that the MCARE Act eliminated WC subrogation for medical practice recoveries, a conclusion rejected by this Court in *Protz v. Workers' Compensation Appeal Board (Derry Area School District)*, 131 A.3d 572 (Pa. Cmwlth. 2016). (Medical Center's Br. at 44.) Third, Medical Center asserts that the only legally effective means for an employer to waive its right to subrogation is by executing a written document expressly waiving that right. *Rissmiller*, 768 A.2d at 1213. Because it has not executed such a waiver, Medical Center argues, there has been no waiver of its subrogation rights. Finally, Claimant's reliance on *Weney* and her assertion that Medical Center did not preserve its subrogation claim during the pendency of the review petitions resolved in the 2013 WCJ Decision are misplaced because neither involved the issue of subrogation. *Weney* involved a situation where a claimant was attempting to relitigate the nature and extent of her work injury, which had been resolved in a prior review petition, a violation of the principle of res judicata. Medical Center maintains no such attempt to relitigate has occurred here.

Pursuant to the plain language of Section 319, which provides that an employer "shall be subrogated," 77 P.S. § 671, subrogation is "automatic" and "by its terms, **admits of no express exceptions, equitable or otherwise**." *Thompson v.*

*Workers' Comp. Appeal Bd. (USF&G)*, 781 A.2d 1146, 1151 (Pa. 2001) (emphasis added).  Thus, our Supreme Court has held that, generally, **the right to subrogation is "statutorily absolute and can be abrogated only by choice**." *Id.* at 1152 (quoting *Winfree v. Phila. Elec. Co.*, 554 A.2d 485, 487 (Pa. 1989)) (emphasis added).[20]  In *Superior Lawn Care*, 878 A.2d at 941, this Court rejected a claimant's assertion of the doctrine of laches as an affirmative defense to an employer's subrogation claim, citing *Thompson*.  Section 319 does not provide a time limitation for an employer to assert a subrogation claim.  *Peeples v. Workmen's Comp. Appeal Bd. (Foster Wheeler Energy Corp.)*, 576 A.2d 1190, 1191 (Pa. Cmwlth. 1990) (rejecting a claimant's assertion that the employer's right to subrogation was waived because it was asserted three or four years after the third-party recovery).

It is undisputed that Medical Center has not expressly waived its right to subrogation by executing an agreement releasing that right.  Accordingly, we address Claimant's laches and res judicata arguments as bases for finding that Medical Center's assertion of its subrogation interest is barred.  Claimant's argument that Medical Center's subrogation claim is barred by the doctrine of laches is contrary to our settled case law that laches, as well as equitable principles in general, are inapplicable to subrogation claims.  *Thompson*, 781 A.2d at 1151; *Young*, 88 A.3d at 302-03; *Superior Lawn Care*, 878 A.2d at 941.  Further, as Medical Center points out, *Liberty Mutual Insurance* did not involve the type of subrogation claim at issue here, and, therefore, does not support Claimant's assertion that Medical Center lost its right to assert its subrogation interest.  The insurer in *Liberty Mutual*

---

[20] There is a narrow exception to this principle where an employer or workers' compensation insurer engages in deliberate, bad faith conduct that subverts a claimant's third-party suit, *Thompson*, 781 A.2d at 1154, but there are no allegations of such conduct in the matter *sub judice*.

*Insurance* asserted a subrogation interest under the second paragraph of Section 319, which is not absolute, unlike subrogation under the first paragraph. *Thompson*, 781 A.2d at 1151. Subrogation under the second paragraph of Section 319 is not self-executing and, therefore, must be asserted with reasonable diligence. *Liberty Mutual Insurance,* 81 A.3d at 1027. Subrogation under the second paragraph of Section 319 must be established by either contract (by the agreement of the parties) or litigation (established during a WC hearing), and, if there is no contract, the insurer must establish its right to subrogation at a hearing before a WCJ or the Board. *Id.* Because subrogation under the first paragraph is at issue here, *Liberty Mutual Insurance* does not apply. As we explained in *Peeples*, the first paragraph of Section 319 does not impose a time limitation on an employer's filing of a subrogation claim. Thus, the 18-month delay between the settlement of Claimant's third-party action and Medical Center's filing of the Modification Petition does not bar Medical Center's subrogation rights.

As for Claimant's assertion that res judicata bars the Modification Petition because Medical Center did not "preserve" its subrogation rights because it did not assert its subrogation rights in the prior proceedings that led to the 2013 WCJ Decision, we note Claimant does not cite to any precedent applying res judicata as a bar to an employer's claim for subrogation under Section 319, and our own research has not revealed any. *See Hill v. Workmen's Comp. Appeal Bd. (J.F. Judski Assocs.)*, 543 A.2d 1279, 1281 (Pa. Cmwlth. 1988) (finding no merit in a claimant's assertion that collateral estoppel barred an employer's Section 319 subrogation claim). *Weney*, cited by Claimant, did not involve subrogation, but the filing of multiple review petitions through which a claimant sought to litigate, and then relitigate, the nature and extent of her work injury. In *Superior Lawn Care*, we rejected the

31

claimant's attempt to use non-subrogation case law to incorporate equitable principles to limit an employer's absolute right to subrogation. 878 A.2d at 941-42. We must, therefore, do the same here. Our Supreme Court has expressed that the only limits to an employer's **absolute right** to subrogation under Section 319 of the WC Act are where the employer limits that right by consent or where the employer engages in deliberate, bad faith conduct that subverts a claimant's third-party suit, *Thompson*, 781 A.2d at 1151, 1154. Because res judicata does not fall within either of these narrow limitations, under our precedent, it is not a defense that can defeat an employer's absolute right to subrogation under the WC Act.

4. Whether Medical Center met its burden of proving the existence of medical malpractice that worsened Claimant's condition.

Finally, Claimant maintains that there was no independent evidence that Dr. Lavelle and Dr. Strain actually committed medical malpractice and the evidence presented, the verdict sheet and high-low arbitration agreement, did not meet Medical Center's burden of proving that medical malpractice occurred. More importantly, Claimant argues, the evidence that was presented to establish that the medical malpractice worsened Claimant's condition, Dr. Harris's opinion, did not include an opinion that Claimant would have sufficiently recovered had it not been for the malpractice or that Medical Center had to pay greater compensation benefits due to the malpractice than it would have had to pay with the initial work injury. Without such evidence, Claimant asserts, the Modification Petition should have been denied.

Medical Center responds that it has no obligation to prove that negligence occurred to establish its entitlement to subrogation against a claimant's third-party recovery. Even if it had to do so, Medical Center asserts that the negligence of Dr. Lavelle and Dr. Strain had already been established in the civil verdict sheet of the

32

arbitrator, which found that both doctors had been negligent in their treatment of Claimant. As for Claimant's assertion that Medical Center's evidence did not support the grant of subrogation, Medical Center points out that Dr. Harris, credited by the WCJ, testified that the actions of Dr. Lavelle and Dr. Strain did cause Claimant to develop the neurological conditions that cause her continuing impairments and need for medical treatment and that, absent the negligence of those physicians, Claimant would have experienced a complete or near complete recovery. (R.R. at 33b-36b.) Such credited evidence, Medical Center argues, satisfied its burden of proving its entitlement to subrogation under Section 319. Dr. Sing's contrary testimony, Medical Center argues, attempted to establish that no medical malpractice occurred on April 29, 2009, notwithstanding Claimant's $2.4 million recovery for that medical malpractice in her civil action.

Where, as here, the negligent conduct occurs subsequent to the original injury, an employer seeking subrogation of a third-party recovery based on that negligence "must show that it was compelled to make payments by reason of the negligence of a third-party, and that the fund to which it seeks subrogation was for the same compensable injury for which it is liable under the Act." *Griffin*, 745 A.2d at 64. To establish that it "was compelled to make compensation payments as result of the negligen[ce]," an employer has to show, by clear and convincing evidence, that but for the negligence, the claimant would have been employable again. *Id.* at 64-65. However, "no formal adjudication of the third party's negligence [is] required" to establish an employer's right to subrogation. *Hill*, 543 A.2d at 1281.

Claimant's arguments reflect a challenge to whether the WCJ's findings of fact are supported by substantial evidence. A review of the evidence proffered by Medical Center, and credited by the WCJ, reveals that those findings are supported

33

and, therefore, are binding on the Court. We agree with Medical Center that, even if it had to establish that Dr. Lavelle and Dr. Strain did commit medical malpractice, this fact was proven not only by the verdict sheet reflecting that both physicians were negligent in their medical treatment of Claimant, but also by the credited expert testimony of Dr. Harris. In that testimony, Dr. Harris opined that the 48-hour delay in Claimant having the surgery "had a drastic impact on her ultimate neurological outcome . . . that lead to ultimately irreversible neurological disability that could have been prevented had she been diagnosed . . . sooner." (S.R.R. at 33b-34b.) In short, Dr. Harris opined that, as a result of the acts of Dr. Lavelle and Dr. Strain in not diagnosing Claimant earlier, Claimant's spinal cord compression continued to worsen, causing her to develop severe neurologic symptoms, an "irreversible spinal cord injury," and an "irreversible neurological disability." (*Id.* at 34b, 36b-37b.)

Dr. Harris's credited opinions also support the WCJ's determination that Medical Center had met its burden of proving its entitlement to subrogation under Section 319. Contrary to Claimant's arguments, Dr. Harris opined that had Claimant undergone surgery to resolve the spinal cord compression within two or three hours of initial presentation, "[h]er outcome would have been dramatically better than it ultimately turned out to be." (*Id.* at 34b.) In Dr. Harris's opinion, Claimant "would likely have had either a complete or nearly complete recovery," and Claimant "would very likely have had an excellent recovery and would have been able to return to work." (*Id.* at 34b-35b.) Dr. Harris explained that Claimant's "deficits . . . developed as a result of persistent progressive spinal cord compression" and "[h]ad that spinal cord compression been relieved by having the discs removed and the spinal cord compression alleviated early on, those subsequent progressive deficits would never have occurred." (*Id.* at 37b-38b.) Reviewing this credited testimony

34

in the light most favorable to Medical Center as the prevailing party, *Frog, Switch & Manufacturing*, 106 A.3d at 206, a reasonable mind would accept it as sufficient to support the conclusions that Medical Center was "compelled to make payments by reason of the negligence of a third[]party, . . . that the fund to which it seeks subrogation was for the same compensable injury for which it is liable under the Act," and that but for the negligence, Claimant would have been employable again. *Griffin*, 745 A.2d at 64-65. Accordingly, we cannot say it was error for the WCJ to find that Medical Center met its burden of proving its entitlement to subrogation under Section 319.

## B. Review Petition

Claimant argues that Dr. Sing's testimony supported the grant of the Review Petition and that the WCJ erred in accepting Dr. Harris's contrary testimony because "it is clear that [Dr. Harris's] testimony did not have an adequate basis in fact" and was, therefore, incompetent as a matter of law. (Claimant's Br. at 12, 26.) According to Claimant, Dr. Harris believed that Claimant's work injury consisted only of injuries to the C6-7 disc, which is contrary to the 2013 WCJ Decision reflecting that the work injury also included radiculopathy at C5-6.

Medical Center responds that the WCJ gave multiple reasons for not accepting Dr. Sing's medical opinions, including that Dr. Sing did not review any of the CT or MRI films himself, relying only on the reports of those studies. Further, Medical Center asserts, Dr. Harris reviewed the films themselves, and he opined that the changes to the discs at C4-5 and C5-6 already existed at the time of the 2009 work injury and were unrelated to that injury or Claimant's April 30, 2009 surgery. Medical Center contends that the WCJ, acting in his role as fact finder, credited its

competent evidence and did not credit Claimant's evidence and, therefore, did not err in denying the Review Petition.

Section 413(a) of the WC Act provides that

A [WCJ] . . . may, at any time, review and modify or set aside a[n NCP] . . . upon petition filed by either party with the department, or in the course of the proceedings under any petition pending before such [WCJ], if it be proved that such [NCP] . . . was in any material respect incorrect . . . ."

77 P.S. § 771. The burden of proof on a review petition seeking to add injuries is the same as a claim petition. *Commercial Credit Claims v. Workers' Comp. Appeal Bd. (Lancaster)*, 728 A.2d 902, 906 (Pa. 1999). Therefore, the claimant bears the burden of proving, among other things, that additional injury was caused by the claimant's work. *Inglis House v. Workmen's Comp. Appeal Bd. (Reedy)*, 634 A.2d 592, 595 (Pa. 1993).

As set forth above, the WCJ is the ultimate fact finder and is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses. *Rife*, 812 A.2d at 755; *Hoffmaster*, 721 A.2d at 1156. The WCJ's determination of evidentiary weight and credibility is not subject to appellate review. *Greenwich Collieries v. Workmen's Comp. Appeal Bd. (Buck)*, 664 A.2d 703, 706 (Pa. Cmwlth. 1995). The competency of a medical witness, however, is a question of law subject to this Court's review. *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 80 (Pa. Cmwlth. 2012). "Where an expert's opinion is based on an assumption that is contrary to the established facts of record, that opinion is [incompetent]." *Taylor v. Workers' Comp. Appeal Bd. (Servistar Corp.)*, 883 A.2d 710, 713 (Pa. Cmwlth. 2005). But an expert opinion is not made "incompetent unless it is **solely** based on inaccurate or false information." *Namani v. Workers'*

*Comp. Appeal Bd. (A. Duie Pyle)*, 32 A.3d 850, 854 (Pa. Cmwlth. 2011) (quoting *Am. Contracting Enters., Inc. v. Workers' Comp. Appeal Bd. (Hurley)*, 789 A.2d 391, 396 (Pa. Cmwlth. 2001)) (emphasis in original). In making this determination, the Court must review the witness's testimony as a whole, and the witness's opinion will not be rendered incompetent unless it was dependent on the inaccurate information. *Namani*, 32 A.3d at 845-55.

Initially, we note that the WCJ did not credit Dr. Sing's expert opinion that Claimant sustained the C4-5 and C5-6 disc hernias as a result of either the original work injury or the April 30, 2009 surgery. (FOF ¶ 19.) Among the reasons the WCJ gave for not crediting Dr. Sing's testimony was that his opinions were based entirely on the reports of other doctors, rather than reviewing the actual films of Claimant's diagnostic tests. (*Id.*) Absent Claimant presenting credited evidence, she cannot prevail in meeting her burden of establishing that the NCP is materially incorrect. However, to the extent the WCJ did not credit Dr. Sing's testimony because Dr. Harris was more credible, we will review Dr. Harris's testimony to determine whether, as Claimant contends, it was not legally competent.

A review of Dr. Harris's testimony as a whole reveals that his opinions were based on his examination of Claimant's medical records and the actual diagnostic studies taken of Claimant's cervical spine over the years. From his review of those studies and records, Dr. Harris opined that the alleged disc hernias Claimant sought to add to the NCP were not work related and had nothing "to do with her current condition." (R.R. at 160a-61a.) Based on his assessment of the 2016 MRI film itself, rather than just the report relied upon by Dr. Sing, Dr. Harris found no disc herniation at C5-6, but did observe disc protrusions at C4-5 and C5-6. (FOF ¶ 12; R.R. at 160a-61a.) However, Dr. Harris opined those changes were degenerative in

37

nature, could be observed in Claimant's prior MRIs, including the one taken on April 30, 2009, and were not related to Claimant's April 30, 2009 surgery. (R.R. at 161a.) According to Dr. Harris, there was no change in Claimant's C5-6 disc between the April 30, 2009 MRI and 2016 MRI and, to the extent there was a change to C4-5, "it would[ not] be unexpected that seven years later there is disc protrusion there[] because . . . degenerative disc disease does tend to progress over[]time . . . ." (*Id.*) While Claimant's accepted work injury includes right C5-6 and C6-7 radiculopathy, (FOF ¶ 4), and Dr. Harris did indicate that Claimant's 2009 injury was to her C6-7 disc and that the injury to that disc and its treatment was the cause of all of her problems ever since, (R.R. at 161a), we do not view Dr. Harris's statement as rendering his testimony incompetent. Dr. Harris's opinion that the C4-5 and C5-6 injuries were not work related was not based on his belief that the work injury involved only the C6-7 disc. Rather, it was Dr. Harris's independent and expert examination of the actual films of Claimant's MRIs, and his understanding of the progressive nature of degenerative disc disease, that formed the basis of his expert opinion. This opinion was corroborated by Dr. Pinsk, who likewise opined that Claimant's initial CT scan and MRI in April 2009 showed preexisting degenerative changes at these levels. (*Id.* at 577a-78a.) Therefore, Dr. Harris's opinion was not based solely on the alleged inaccurate information and, accordingly, his opinion was not incompetent as a matter of law and the WCJ could rely upon it to reject Dr. Sing's conflicting testimony. *Namani*, 32 A.3d at 854. Because Claimant's evidence was not credited, she could not meet her burden of proof on the Review Petition.

*C. Litigation Costs*

Claimant argues that the WCJ erred in not awarding litigation costs because she prevailed on her request, set forth in the Review Petition, to expand her work injury to include a psychological injury. Claimant notes that, despite Medical Center's admission that she sustained this injury, it did not issue any official document accepting that injury. Therefore, Claimant contends, she still had to litigate this issue before the WCJ. Claimant maintains that, because the WCJ added this injury after the litigation, she prevailed "in part" in her litigation, and she is entitled to the payment of her litigation costs under Section 440(a) of the WC Act, 77 P.S. § 996(a).[21]

Medical Center argues that because the WCJ did not err in denying the Review Petition or in granting the Modification Petition, Claimant did not prevail on any contested issue and was not entitled to litigation costs under the WC Act. Medical Center asserts that the litigation costs Claimant incurred, which primarily were related to Dr. Sing's examination and deposition, were to establish that the claimed additional cervical injuries were work related and to contest the Modification Petition. Because Claimant did not prevail on either of those issues, Medical Center argues there was no error in denying litigation costs.

Section 440(a) of the WC Act provides, in relevant part, that

> [i]n any contested case where the insurer has contested liability in whole or in part, . . . the employe or [her] dependent, as the case may be, in whose favor the matter at issue has been finally determined in whole or in part shall be awarded, in addition to the award of compensation, a reasonable sum for costs incurred . . . .

---

[21] Added by Section 3 of the Act of February 8, 1972, P.L. 25.

77 P.S. § 996(a). However, in order to be awarded litigation costs, the "claimant must prevail **on the contested issue**." *Jones v. Workers' Comp. Appeal Bd. (Steris Corp.)*, 874 A.2d 717, 721 (Pa. Cmwlth. 2005) (emphasis added).

Here, Claimant's litigation efforts sought to expand the definition of her work injury to include both additional cervical injuries and a psychological injury and to challenge Medical Center's Modification Petition. While Medical Center contested Claimant's attempt to add the C4-5 and C5-6 disc hernias to her work injury, it did not contest the existence of the psychological injury and, in fact, had been paying for Claimant's medical treatment for the psychological injury. As a result of Medical Center's admission, the WCJ added the uncontested psychological injury to Claimant's NCP without Claimant ever having to present evidence to establish that her psychological injury was work related. Contrarily, the WCJ did not find that Claimant established that the disc hernias at C4-5 and C5-6 were work related because he did not credit Dr. Sing's opinions, thereby precluding Claimant from meeting her burden of proof on the only contested issue. Further, Claimant was unsuccessful in defending against the Modification Petition. Because Claimant did not prevail on the only contested issue in the Review Petition or on her contest of the Modification Petition, we cannot say the Board and the WCJ erred in denying the reimbursement of Claimant's litigation costs. *Id.*

## III. Conclusion

For the foregoing reasons, we discern no error in the Board's affirmance of the WCJ's grant of the Modification Petition, denial of the Review Petition, and denial of Claimant's request for litigation costs. Accordingly, we affirm.

_____
**RENÉE COHN JUBELIRER,** Judge

40

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Anna Griffis, : 
           Petitioner : 
          : 
        v. :   No. 272 C.D. 2019
          : 
Workers' Compensation Appeal : 
Board (Albert Einstein Healthcare : 
Network), : 
          Respondent : 

## O R D E R

    **NOW**, July 15, 2020, the Order of the Workers' Compensation Appeal Board, entered in the above-captioned matter, is **AFFIRMED**.


                           _____

                           **RENÉE COHN JUBELIRER,** Judge